1  **Rollin A. Ransom, SBN 196126**
   **rransom@sidley.com**
2  **Collin P. Wedel, SBN 278461**
   **cwedel@sidley.com**
3  **SIDLEY AUSTIN LLP**
   **555 West Fifth Street, Suite 4000**
4  **Los Angeles, California  90013**
   **Telephone:  (213) 896-6000**
5  **Facsimile:  (213) 896-6600**
6
   **John J. Kuster (*pro hac vice* forthcoming)**
7  **jkuster@sidley.com**
   **Elise Young (*pro hac vice* forthcoming)**
8  **eyoung@sidley.com**
   **SIDLEY AUSTIN LLP**
9  **787 7th Avenue**
   **New York, New York 10019**
10 **Telephone: (212) 839-5300**
   **Facsimile: (212) 839-5599**
11
12 **Attorneys for The Confederation of**
   **North, Central American and Caribbean**
13 **Association Football**

14                UNITED STATES DISTRICT COURT

15                CENTRAL DISTRICT OF CALIFORNIA

16

| | |
|---|---|
| 17  The Confederation of North, Central American and Caribbean Association Football, | Case No. 2:15-CV-09774 |
| 18 | |
| 19                    Plaintiff, | **COMPLAINT FOR DAMAGES** |
| 20           v. | **JURY TRIAL DEMANDED** |
| 21  Elmore Sports Group, Ltd.; Cartan Tours, Inc.; iSportsMarketing, LLC; Gant Travel, Ltd.; David G. Elmore; and Daniel L. Gamba, | |
| 22 | |
| 23                    Defendants. | |
| 24 | |
| 25 | |

26
27
28

1.     This action is brought pursuant to 28 U.S.C. § 1332(a) by Plaintiff, the Confederation of North, Central American and Caribbean Association Football ("CONCACAF"), a not-for-profit Bahamian corporation with its principal place of business in Miami, Florida, against Defendants Elmore Sports Group, Ltd.("Elmore Sports"), Cartan Tours, Inc. ("Cartan Tours"), iSportsMarketing, LLC ("iSportsMarketing"), Gant Travel, Ltd. ("Gant Travel"), David G. Elmore ("Elmore") and Daniel L. Gamba ("Gamba") (collectively, "Cartan"), each of which is diverse from CONCACAF.  CONCACAF seeks monetary and equitable relief to redress the harms caused by Cartan's fraudulent, unfair, and unlawful business practices. Those practices include maintaining a clandestine, kickback-based, and parasitic relationship with two of CONCACAF's former executives, Jeffrey Webb ("Webb") and Enrique Sanz ("Sanz"), in which Cartan, Webb, and Sanz illicitly enriched themselves by raiding CONCACAF coffers without the knowledge of CONCACAF's executive committee or other members of the CONCACAF staff.

2.     Defendants were to provide travel, accommodation and event planning services to CONCACAF for CONCACAF's many events and meetings.  The logistical expense involved to move teams throughout numerous venues, for example, was the largest category of expense CONCACAF had to incur.  As explained in greater detail below, despite not having the expertise to provide the breadth and scope of services CONCACAF required or had enjoyed in the past, Webb and Sanz awarded Cartan an exclusive arrangement to provide the logistic services required for all of its events and meetings.  But there was no RFP process, no CONCACAF staff with expertise in travel logistics were involved in the selection of or negotiations with Cartan, and no approval from CONCACAF's Executive Committee (the "ExCo") was ever obtained.

3.     Instead, Webb and Sanz engaged in their typical *modus operandi* of obtaining kickbacks from large vendors wishing to do business with CONCACAF, and Cartan was more than happy to oblige them, because Defendants acquired an

outrageously lucrative arrangement for themselves.  For example, Cartan charged an astounding 18% management fee for booking flights, when a typical travel agency, like the one CONCACAF used before Cartan, charged a small per-transaction flat fee. Cartan also charged CONCACAF an 18%  management fee for its other event management services while its competitors charged nothing close to that for similar services previously provided to CONCACAF.  Defendants, Webb and Sanz also carefully orchestrated their scheme to undermine the ability of CONCACAF staff or the ExCo to have any understanding of the true nature of the relationship: Cartan and Webb and Sanz precluded staff from seeing contracts with third party vendors (like hotels) or other receipts for charges CONCACAF paid through Cartan; Cartan directed its agents to never discuss the full extent of their fees with CONCACAF; CONCACAF directors responsible for events, who were initially effective at reducing costs, were no longer allowed to review Cartan invoices; and financial reports to the ExCo were scrubbed to avoid providing any detail that could have otherwise raised suspicions.

4.     In a highly-publicized sting on May 27, 2015 in Zurich, Switzerland, Webb and certain other high ranking executive committee members attending the Congress of Federation Internationale de Football Association ("FIFA") were arrested by Swiss authorities at the request of the United States Department of Justice ("DOJ"), alleging a series of commercial bribery and kickback schemes that Webb and his co-conspirators, including Sanz, had used to victimize CONCACAF and other soccer entities over the years.  The DOJ announced on December 3, 2015 that Webb pled guilty to racketeering conspiracy, fraud and money laundering charges – including kickback and commercial bribery schemes – which breached his fiduciary duties to CONCACAF.  Once Webb and Sanz were no longer at the helm of CONCACAF, it eventually became clear these two corrupt ex-officers similarly infected other vendor relationships with their nefarious self-dealing and kickback schemes, including their improper dealings with Cartan.

COMPLAINT FOR DAMAGES

5.     Defendant Cartan's improper conduct was intentional, deceptive and designed to benefit themselves to the detriment of CONCACAF.  This conduct ranged from overrunning cost projections to gerrymandering invoices to outright lies.  As detailed below, the Cartan relationship with CONCACAF was a distorted one-sided affair in which Cartan used CONCACAF as a proverbial cash cow, overinflating charges, overstaffing events, and increasing CONCACAF's logistical expenses because Cartan received an 18% management fee on top of every dollar CONCACAF spent on logistics for its events, large and small.  Indeed, the expenses of CONCACAF's premier event – the Gold Cup – increased over 100% from the 2011 Gold Cup to the 2013 Gold Cup once Defendants scheme was in place.  Although Cartan was given an exclusive arrangement, with a huge captive volume of business, Cartan charged super-inflated prices, and they were able to keep on charging CONCACAF those outrageous fees even though Cartan services were poor and inferior to what CONCACAF staff and other vendors previously provided for CONCACAF events and meetings.  No rational business would have tolerated this new arrangement with Cartan.  There is only one reason that Cartan was able to continue this scheme: it had a secret deal with Webb and Sanz to pay them off.

6.     As a consequence of this commercial bribery scheme, CONCACAF has been significantly damaged, and it is entitled to restitution of the illicit overpayments and profits paid to Cartan and payments made to Webb and Sanz, as well as to an award of punitive damages as a message to Cartan and others that they cannot get away with victimizing sports organizations like CONCACAF, its member soccer associations most of which depended on CONCACAF for a large portion of their funding, and indeed, all of the soccer fans who at the end of the day are also victims of Cartan's misconduct.   CONCACAF therefore seeks compensatory and punitive damages in an amount to be determined at trial, but not less than $50 million.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(2) because CONCACAF is the subject of a foreign state with U.S. headquarters in Miami, Florida, each of the Defendants is a citizen of and resides in Los Angeles County, California, or in Indiana, making the parties diverse, and the matter in controversy exceeds $75,000.

8.     Venue is proper in this District under 28 U.S.C. §§ 1391 (b)(1)-(2) and (d) because a substantial part of the acts giving rise to this claim occurred in this jurisdiction, and because Defendants reside in this District for venue purposes.

## PARTIES

9.     CONCACAF is a not-for-profit football organization that administers the sport regionally across 41 member associations.  Headquartered in Miami, Florida and incorporated in the Commonwealth of the Bahamas, CONCACAF manages regional competitions, provides training, and fosters grassroots and youth participation in the sport.

10.     On information and belief, Defendant Elmore Sports Group is a corporation organized and existing under the laws of Delaware, with its principal place of business in Manhattan Beach, California.

11.     On information and belief, Defendant Cartan Tours is a corporation organized and existing under the laws of Delaware with its principal place of business in Manhattan Beach, California.

12.     On information and belief, Defendant iSportsMarketing is a corporation organized and existing under the laws of Texas with its principal place of business in California.

13.     On information and belief, Defendant Gant Travel is a corporation organized and existing under the laws of Indiana with its principal place of business in Bloomington, Indiana.

COMPLAINT FOR DAMAGES

14.    On information and belief, Defendant Elmore is an individual, a citizen of the state of California, and the owner and Chief Executive Officer of Elmore Sports Group and Cartan Tours.

15.    On information and belief, Defendant Gamba is an individual, a citizen of the state of California, and at all times relevant to this complaint employed as the Executive Vice President at Cartan Tours, and a Managing Director of iSportsMarketing.

16.    At all relevant times, Defendants Cartan Tours, iSportsMarketing, Gant Travel, Elmore and Gamba were subsidiaries, members, officers or otherwise affiliated with Elmore Sports Group and/or acted in concert with them and each other to commit the fraud and other tortious acts against CONCACAF alleged herein. Defendants' alleged acts and omissions have been committed collectively by all Defendants, all of whom are collectively referred to as "Cartan" herein, unless particular allegations are otherwise specifically limited.

## GENERAL ALLEGATIONS

## CONCACAF

17.    CONCACAF is the not-for-profit continental governing body for association football in North America, Central America and the Caribbean. CONCACAF is one of six confederations of FIFA, which identifies itself as football's international governing body.  The term "football" as used herein refers to what in the United States is often referred to as "soccer," but throughout the rest of the world is referred to as "football."  CONCACAF is composed of 41 member associations, each representing organized football in a particular nation or territory in North America, Central America, and the Caribbean.

18.    CONCACAF manages competitions, offers technical and administrative training courses for football clubs and actively promotes the development of football throughout the region.  On a biennial basis, CONCACAF hosts and arranges the Gold Cup, a month-long tournament for the region's national football clubs hosted across

13 different cities in the United States, including California.  In October 2015, the last two Gold Cup winners, the United States and Mexico, held a play off game at the Rose Bowl for the winner to participate in a FIFA-sponsored Confederations Cup. CONCACAF also hosts and arranges an annual Champion's League tournament, in which the best professional football clubs in the region participate.  CONCACAF also has an annual meeting of its Congress, attended by representatives from each of the member associations, staff and others.

19.     Funds generated from CONCACAF events are not held as corporate profits, but rather are utilized to support CONCACAF operations, and provide financial support to these member associations in many forms.  For example, CONCACAF provides funds and tournament prize monies which are typically used for youth programs, infrastructure, referees, sports integrity, and other development purposes.  Increased logistical costs for events directly impacts the amount of funds available for these and other CONCACAF operations as well as the funding available to member associations and any CONCACAF programs designed to assist football teams, clubs, youth and overall fan support for football throughout the CONCACAF region.   The more money paid to Defendants, the less money available to fund CONCACAF to use for these purposes.

20.     CONCACAF is managed by an Executive Committee ("ExCo"), a board responsible for administering CONCACAF, and the President, an officer elected by the member associations to engage in executive decision-making on behalf of the ExCo.  CONCACAF appoints a General Secretary charged with assisting the President and the ExCo in administering CONCACAF.  CONCACAF also is governed pursuant to a number of statutes and codes adopted by its Congress, including a Code of Ethics, all of which are published on CONCACAF's website and available to the general public.  As a confederation of FIFA, CONCACAF is also subject to the FIFA Statutes and governing regulations of FIFA, including the FIFA

Code of Ethics, all of which are published on FIFA's website and available to the general public.

21.    The growth of CONCACAF and the popularity of football in the region unfortunately attracted individuals seeking to improperly profit from it.  In 2012, after Jack Warner resigned as CONCACAF's President following revelations regarding his numerous self-serving and corrupt schemes, Webb was elected as President and Sanz was appointed General Secretary.  Both promised to usher in a new era of transparency and reform for CONCACAF.  In keeping with their promise of reform, Webb and Sanz established an Integrity Committee to investigate and provide recommendations with respect to corporate governance and other issues to address past misconduct of the former President and General Secretary.  To that end, Webb and Sanz were also cognizant of the efforts that were undertaken to conduct the investigation, including the collection and review of CONCACAF financial records and communications, including emails.

22.    Webb and Sanz, however, never intended to practice what they preached. They used the Integrity Committee investigation and pronouncements of reforms to cloak their misconduct from the ExCo and CONCACAF staff.

23.    Webb and Sanz's willingness to betray CONCACAF and the sport of football in their "pay to play" schemes of bribes and kickbacks is described in the Department of Justice's 47-count indictment, filed on May 20, 2015 (the "Indictment"), which resulted in Webb's arrest, on May 27, 2015, as well as a 236 page Superseding Indictment that was unsealed by the DOJ on December 3, 2015. The Indictment and Superseding Indictment not only provide details of Webb's alleged crimes, but also provide insight into the harm caused to CONCACAF as a victim of Webb's financial crimes.

24.    The Superseding Indictment also alleges that Webb, Sanz and their co-conspirators "engaged in conduct designed to prevent the detection of their illegal activities, to conceal the location and ownership of proceeds of those activities, and to

promote the carrying on of those activities" (Superseding Indictment, ¶ 96) – conduct that Webb and Sanz also engaged in with respect to their illicit arrangement with Cartan.  The Indictment and Superseding Indictment go on to implicate Sanz as an unnamed co-conspirator who facilitated the commission of the alleged bribes and kickbacks, some of which began decades ago.  The Indictments detail the *modus operandi* of Webb and Sanz, demanding kickbacks and bribes in exchange for doing business with CONCACAF, and employing elaborate schemes through third parties and others to obfuscate payments, often utilizing bank accounts in Panama, a country with heightened bank secrecy laws.  Internet reports show that Cartan had a presence in Panama as well.  As noted above, on December 3, 2015 the DOJ also announced that Webb pled guilty to a racketeering conspiracy charge, three counts of fraud and three counts of money laundering with respect to these many "pay to play" schemes.

25.    Webb and Sanz used the power of their positions for selfish profiteering and misconduct at the expense of CONCACAF.  From 2012 to 2015, Webb and Sanz monitored committee meetings and instructed employees to doctor financial reports provided to the ExCo to hide the nature of their relationship with vendors, including Defendants here, *i.e.*, Cartan.  None of those vendors should be allowed to profit from the massive conspiracy and fraud they engaged in that victimized CONCACAF, its member associations and the countless soccer enthusiasts and fans it serves.  Accordingly, CONCACAF has brought this lawsuit against the Cartan Defendants to right those wrongs by asking a jury to award compensatory and exemplary damages against Defendants.

## Cartan

26.    According to its website, Cartan Tours is a group of companies engaged in the business of providing travel and accommodation arrangements, and allegedly specializing in "exclusive and official travel and ticketing services" to high profile sporting events including the Olympic Games and the World Cup.  Cartan Tours provides small hospitality packages for families or corporate groups.  It is managed by

Elmore, its President and founder of Elmore Sports Group and co-director of iSportsMarketing, the affiliate that issued invoices to CONCACAF for Cartan.  When he first joined, Gamba was only a Program Manager who helped arrange routine small-group travel packages.  As explained further below, eventually he was promoted to Executive Vice President and co-director of iSportsMarketing but only after helping to arrange the illicit scheme that caused CONCACAF to provide Cartan with a lucrative, exclusive arrangement as the provider of logistic-related services to CONCACAF.  Gant Travel provided airline ticketing services, with both Gant and other Cartan employees reporting to Gamba and Elmore.

**Cartan, Webb and Sanz**

27.     Upon information and belief, Cartan never maintained or executed a business transaction of similar nature and scale as the one arranged with Webb and Sanz.  Prior to its involvement with CONCACAF, Cartan's customers were primarily U.S. residents seeking to purchase resale tickets to the Olympics.  Cartan did have arrangements with certain entities, such as the U.S. Olympic Committee, for the purchase of large blocks of tickets, which Cartan would resell to the general public.  Cartan also managed "hospitality suites" by setting up tents for corporate sponsors or other large groups at major sporting events, such as FIFA matches or the U.S. Olympics.   However, prior to October 2012, Cartan never provided the kinds of travel, accommodation and event management services it did for CONCACAF on an exclusive, long-term basis, nor charged the kinds of management fees it did with respect to the services it provided.

28.     At the time, CONCACAF was not in need of Cartan's services, and certainly not on an exclusive basis.  Logistics for its events was by far CONCACAF's largest category of expense.  Prior to 2013, CONCACAF's staff booked all of the every-day travel needs of the organization through a typical travel agency fee structure where the agency charged an industry standard per-transaction fee, not one based on a percentage of the bookings.

9

29.   For accommodations, CONCACAF negotiated directly with hotels and companies that provided ground transportation for its larger events and tournaments. For event planning services required for larger events, such as the 2011 Gold Cup, CONCACAF primarily utilized a company called Byrom—a reputable travel management company used by FIFA—which had a proprietary event management software that made coordination of events and bookings run smoothly for CONCACAF.  Byrom's event services included managing the logistics of the events, specific bookings of rooms for teams, meals and conference rooms for various meetings, and addressing other amenities or logistical arrangements required to put on a large tournament, including management of VIP services.  Byrom provided full copies of all signed hotel contracts and invoices by third parties to CONCACAF for the 2011 Gold Cup.  Byrom charged a  management fee based on the hourly rates of its staff.  It did not separately charge for reconciling invoices and its fees after events. Byrom's management fee for the 2011 Gold Cup was a fraction of the management fee Cartan later charged CONCACAF for the comparable 2013 and 2015 Gold Cup tournaments.  Indeed, upon information and belief, Byrom had an exclusive arrangement with FIFA to provide event management services for the FIFA World Cup events (which were much larger than the CONCACAF Gold Cup events) and charged FIFA a management fee that was far less than what Cartan charged CONCACAF.

30.   The CONCACAF staff and ExCo who were responsible for the Gold Cup were by and large satisfied with Byrom's services, transparency and their valuable event management software that allowed the events to run smoothly, and had no material issues with Byrom.

31.   Defendants, Webb and Sanz, however, recognized there was an opportunity to enrich themselves by exploiting CONCACAF's largest category of expense if they could displace Byrom.  The arrangement entered into by Elmore and Gamba, by and through Cartan, with Webb and Sanz created a vastly greater source of

work and income of a scale and complexity that Cartan knew it could not competently handle.  Knowing that it was out of its league and could not possibly compete as an above-board business or through a competitive bidding process, the Defendants concluded that they had to do something illicit and improper—get the business by paying off Webb and Sanz personally and secretly through bribes and kickbacks.  The special benefits provided to Webb and Sanz not only allowed Cartan to get an exclusive arrangement to provide CONCACAF with all travel, accommodation and event planning services, but it allowed Cartan to charge CONCACAF exorbitant prices for its services, which Webb and Sanz approved and hid from the ExCo and CONCACAF staff.  Indeed, a normal exclusive arrangement for such services from an inexperienced service provider lacking the proper expertise would be expected to drive the fees down significantly in exchange for a guaranteed increase in the volume of business being directed its way.  But the opposite happened in this relationship.  CONCACAF was charged exorbitant prices far in excess of what it paid before, and these excessive prices came in exchange for inferior service.  No rational company would ever have entered into an arrangement like this for such services.

32.     There is only one possible explanation for such an economically irrational arrangement: the relationship was equally lucrative for Webb and Sanz, who received substantial, personal benefits from Cartan over the course of Cartan's parasitic relationship with CONCACAF.  Webb and Sanz were experts at creating kickback and bribery schemes, and their relationship with Cartan, involving an arrangement generating tens of millions of dollars, was no exception.  Cartan's scheme with Webb and Sanz was well outside the bounds of a legitimate business agreement, arranging a flow of excessive and unreasonable funds from CONCACAF to Cartan, and in turn, providing Webb and Sanz with kickbacks.  Cartan's unlawful and clandestine scheme was fraudulent from its inception in 2012, and secured  a staggering $40 million of business from CONCACAF generating not less than $10

1   million in illicit profits, payments and other overcharges to CONCACAF during the

2   nearly three years they were able to keep the scam alive.

3   **The Origins of Cartan's Conspiracy with Webb and Sanz**

4   33.   In 2009, Cartan lost a large source of income when the US Olympic

5   Committee denied their bid for the US ticket resale market for the 2012 London

6   Olympics, according to articles in the press.  Cartan could not rely on getting this

7   lucrative future business from the U.S Olympic Committee in the near future.  Upon

8   information and belief, Cartan was unsuccessful in finding a replacement for the lost

9   U.S. Olympic Committee business.  So it had to look for new opportunities, but those

10  opportunities did not come by often, and, upon information and belief, Cartan did not

11  find anything close to the U.S. Committee arrangement until 2012—when it found

12  CONCACAF.

13  34.   Cartan sent Gamba to the 2012 London Olympics.  Gamba was not

14  Executive Vice President at that time, but an employee whose major function was to

15  host guests at the "Casa Cartan" hospitality tent, where he posed for photos and resold

16  pairs of tickets to particular sporting events.  Gamba managed to resell some of these

17  tickets to Bruce Blake ("Blake") and Canover Watson ("Watson"), two Cayman

18  Island Football Association ("CIFA") officials attending the Olympics with Webb,

19  who also was CIFA President at the time and their close personal friend.  CIFA is a

20  CONCACAF member association.

21  35.   After meeting Watson, Gamba persistently emailed him and Blake to

22  arrange a meeting to discuss a purported "partnership" with Cartan's Chairman,

23  Elmore.  In August 2012, Watson and Webb met with Gamba at the May Fair Hotel

24  while in London.  As a result of this secret meeting, Cartan was on its way toward

25  securing all of CONCACAF's  travel arrangement business for not only their first

26  event, but for every major CONCACAF event and competition for the foreseeable

27  future. On October 23, 2012, Sanz and Gamba met again, and agreed in an email that

28  CONCACAF would use Cartan for all their needs "from Staff travel to ExCo

12

Meetings, committee meetings, Congress and Gold Cup."  Although Sanz purportedly confirmed CONCACAF's willingness to enter into such an arrangement with Cartan, no other CONCACAF staff or ExCo members were informed of the meetings, or such an arrangement at or before the time this apparent commitment was made, even though this arrangement involved millions of dollars with respect to the largest annual category of expense CONCACAF incurred.

36.     Gamba was subsequently rewarded for securing the CONCACAF business with a promotion at Cartan to Executive Vice President that was announced shortly after the October 23, 2012 meeting.

37.     In early November, after this meeting, Sanz began to inform certain staff members that he had retained a new service to provide logistical services to CONCACAF.  At that time, Ted Howard, CONCACAF's Deputy General Secretary, was told for the first time about the retention of Cartan for travel management.  On November 13, 2012, Gamba noted in an email to Sanz that they should get a "contract" signed, and told Sanz that Watson (a man currently on trial for fraud as the result of kickbacks associated with his own business dealings in the Cayman Islands in which he is alleged to have diverted CIFA funds for Webb's personal use) was working on the agreement with Cartan's lawyers.  However, no such written contract in fact existed, at least before a copy of a purported agreement was finally provided to CONCACAF staff in September 2014.  Moreover Watson, while a personal friend of Webb, was neither a lawyer, nor a person with any relevant experience to make him competent enough to handle legitimate negotiations regarding travel, accommodation or event planning services.  Rather, Watson and Webb were experts at creating schemes for kickbacks and commercial bribes in exchange for lucrative contracts.

38.     When Sanz emailed Webb on November 15, 2012 concerning the significant logistics to be worked out between Cartan and CONCACAF, Webb cautioned: "lots to discuss before moving forward."  Upon information and belief,

13

what needed to be more firmly discussed "before moving forward" were the details of the scheme.  As with the other lucrative financial agreements that personally and illicitly benefitted Webb and Sanz, the parties needed to discuss the details of the kickback scheme that would ensure Cartan would arrange for kickbacks and/or other improper remuneration to Webb and Sanz before Cartan began its work in earnest.

39.    On December 3, 2012, Watson helped facilitate a meeting between Webb, Elmore and Gamba, to discuss the terms of their deal behind closed doors before "moving forward."  Shortly after the meeting, Sanz announced Cartan's appointment as CONCACAF's exclusive logistics agency to CONCACAF's staff more broadly.  Upon information and belief, the final terms of the arrangement to provide kickbacks and/or other improper remuneration to Webb and Sanz had been agreed to and/or confirmed at that meeting.  None of the true terms discussed at this clandestine meeting were provided to the CONCACAF ExCo, nor CONCACAF staff.  Cartan, Webb, and Sanz's deliberate secrecy and omissions regarding their arrangement, and the true reason behind Cartan's retention, were a central component of their fraudulent scheme.

40.    In contrast to the completely behind-closed-doors agreement between Webb, Sanz, and Cartan, other major contracts at least went through an RFP process that included input, vetting, review and approval from the ExCo members, attorneys for CONCACAF, and/or knowledgeable CONCACAF staff who participated in the negotiations or review of those agreements.  The Cartan deal also diverged from other major contracts at CONCACAF because Cartan, Webb and Sanz caused CONCACAF to pay Cartan and its affiliate Defendants hand-over-fist for at least the first year without any written agreement in place, let alone an agreement that fully disclosed the actual terms of the parties' relationship.

41.    Cartan, Webb and Sanz intentionally concealed the full scope and true terms of the arrangement at Cartan's behest and/or with Cartan's knowledge, and otherwise minimized the ExCo's ability to understand it.  Sanz had financial

presentations to the ExCo scrubbed of any details which could have exposed the sheer expense of the Cartan relationship.  He instructed CONCACAF's finance employees to shade Cartan's charges, already intentionally produced without detail by Cartan to facilitate such obfuscation, so that Cartan-related costs were not separately identified.

### The Cartan Scheme Beginnings and the Panama Congress

42.    Cartan initially began its work by providing transient travel services for CONCACAF.  In December 2012, Sanz informed CONCACAF staff that Cartan had been "appointed" CONCACAF's new agency to deal with travel and accommodations needs as part of the new structure at CONCACAF.  However, at this point there was no written agreement in place, and Sanz never explained to anyone why this new agency was being appointed, what the terms and conditions of its services were, or what Cartan's fee structure would be for these new services.

43.    It was clear almost immediately that Cartan was not providing any savings to CONCACAF under this new arrangement but instead causing dramatic cost increases.  In January 2013, for example, CONCACAF staff observed that Gant Travel—who was doing all of the bookings for CONCACAF travel—did not have any kind of special relationships with hotels to be able to secure favorable rates. CONCACAF staff were able to book hotel rooms at much more favorable room rates, for example, by calling directly rather than using Cartan.

44.    This is not surprising.  Cartan's scheme with Webb and Sanz created the perverse incentive for Cartan to find the *highest* prices, because Cartan could charge CONCACAF a hefty 18% on every booking.  The more money CONCACAF had to pay for travel and accommodations, the more money Cartan could skim from the top, and the more money became available to pay kickbacks to Webb and Sanz.

45.    Cartan began to send invoices to CONCACAF for the first time in February 2013.  However, Cartan never provided any evidence to CONCACAF to corroborate any of the services provided.  Instead, Cartan would merely provide

summaries of the charges incurred by CONCACAF for travel and accommodations. Defendants would total the summary charges, and then add on their management fee, which at first was close to 22%.  In contrast, prior to Cartan CONCACAF always had access to contracts with third party vendors like hotels for all of its events.  Cartan also routinely added charges for its staff—most of which was from a temporary work force—thus increasing the final costs and ultimately receiving their management fee percentage on every single dollar spent.

46.   Sanz and Webb uniformly approved every invoice submitted by Cartan during their tenure, without fail.  Those two were the only ones at CONCACAF who were authorized to pay (or reject) Cartan invoices.

47.   Cartan's first major event for CONCACAF was the association's Congress in Panama in April 2013.  Webb opened the Congress stating, "Today's Congress marks a defining moment for CONCACAF's vision of a truly transparent future."  However, we now know that the opposite was true:  Webb and his confederates (including Cartan) had no intention of sharing their backroom kickback schemes.  Despite CONCACAF employees' requests,  Cartan intentionally never provided or even allowed CONCACAF personnel other than Webb and Sanz to view any contractual arrangements regarding hotel accommodations.  This was in stark contrast to the procedures that existed for the 2011 Gold Cup, when CONCACAF received every hotel contract.  Moreover, Cartan did not just leave CONCACAF employees out of the loop but affirmatively instructed their travel agents not to discuss its fees with CONCACAF employees when booking travel arrangements like flights to keep them in the dark and avoid having CONCACAF employees demand Cartan find lower prices.

48.   When CONCACAF staff asked Cartan for executed hotel contracts, instead of providing them, Cartan deliberately withheld the contracts from CONCACAF employees.  Cartan eventually provided only summaries that did not show the full extent of the hotel agreement, impairing CONCACAF's ability to

1  confirm the veracity of Cartan invoices or to ensure the most favorable pricing was

2  being obtained by Cartan. Of course, the opposite was true: Cartan was doing

3  whatever it could to make sure CONCACAF was paying on the high-end of the

4  scale whenever possible.

5        49.    CONCACAF employees escalated their concerns regarding the lack of

6  hotel contracts to Webb and Sanz. Instead of pressing Cartan on CONCACAF's

7  behalf, Webb and Sanz, with Cartan's knowledge and/or at Cartan's direction, shut

8  down any and all exchange regarding requests for contracts. To take but one example

9  of many, a staff member who emailed Gamba in February 2013 demanding a copy of

10  a hotel contract was hastily instructed by Sanz to send another email to Gamba stating

11  "DISREGARD."

12        50.    Upon information and belief, as Cartan profited, Webb and Sanz

13  personally benefited. Despite growing complaints and questions among CONCACAF

14  employees, Gamba's influence with Webb and Sanz expanded. The two routinely

15  invited Gamba and Elmore to many CONCACAF events and he otherwise had easy

16  access to them.

17        51.    Cartan also invoiced CONCACAF close to $600,000 for the Panama

18  Congress event. Of that amount, over $165,000 related to *Cartan's fees alone*,

19  including a $93,000 management fee, and $77,000 for payments related to Cartan

20  excessive staff at over-inflated hourly charges. Cartan separately invoiced

21  CONCACAF for airfare for this event, charging an additional 21.95% for

22  management fees related to its travel agency services—even though CONCACAF's

23  previous corporate travel agency fees were charged at a per-transaction basis of $35 to

24  $45 for domestic and international bookings, which would have resulted in

25  CONCACAF paying vastly lower prices had this been an above-board arrangement.

26        52.    Although Cartan charged outrageously high rates, Cartan's performance

27  during Panama Congress was remarkably poor, and CONCACAF staff believed

28  Cartan was not up to the task and shared their views about Cartan with Webb and

Sanz.   Nevertheless, Cartan's role expanded while at the same time the ability of CONCACAF staff to monitor costs and expenses decreased.

### 2013 Gold Cup

53.     In 2013, Webb and Sanz selected Cartan to provide travel and accommodation services for CONCACAF's flagship event, the Gold Cup, despite CONCACAF employees' vocal criticism of Cartan's dismal handling of the Panama Congress and other events prior to the Gold Cup.  Cartan controlled all travel and accommodations for CONCACAF's Gold Cup, while CONCACAF used two vetted, reputable, and experienced outside vendors for VIP arrangements.

54.     In the months leading up to the Gold Cup, Cartan artificially inflated the invoices it sent to CONCACAF, billing CONCACAF for  substantial sums without any support, backup documentation, or receipts.

55.     On March 1, 2013, Cartan sent CONCACAF a single sheet of paper charging $1,250,000 for "estimated" costs related to future Gold Cup hotel and accommodations expenses, and then on June 7, 2013 invoiced CONCACAF for another $750,000 which it claimed was a deposit required by hotels for food and beverage services.  CONCACAF never provided advanced payments directly to a travel service provider based only on such large "estimates" before, especially without any backup hotel contracts justifying these large payments, or without a written agreement in place with a vendor to which it was sending millions of dollars.   This advance of $2 million provided a large, up front cash flow to Defendants—no doubt in part to allow them to line the pockets of themselves and their co-conspirators, Webb and Sanz, without any ability to trace how the money CONCACAF was paying Cartan was being used.

56.     Despite being told about troubling invoices and the staff raising concerns, Sanz approved these invoices and instructed that they be paid without further inquiry.

57.     When Ted Howard, CONCACAF's Deputy General Secretary at the time, asked Gamba for an estimate on the hotel rates for the 2013 Gold Cup that

Cartan was responsible for, he was astounded at what Cartan eventually provided: Gamba's own work product containing hotel rates seemingly pulled out of thin air. Cartan never sent a hotel contract or official estimate from a single accommodations provider.  Howard,  observing Cartan's expensive rates, reminded Gamba, that "it was you who told me that you could get rates below $200 because we were all concerned." In fact, the expensive Cartan hotel rates were before  Cartan added on its hefty management fee that would result in millions of additional expenses for the 2013 Gold Cup – higher expenses CONCACAF had never incurred before for any other previous Gold Cup.  Indeed, CONCACAF was given no ability to negotiate Cartan staff levels or staff rates, while being charged for pre- and post-event services (including Cartan's "reconciliation" of advances CONCACAF paid and actual event costs).  Cartan also charged the 18% management fee to CONCACAF for travel and accommodations of its own staff to these events.  Cartan's creativity in finding new ways to charge exorbitant prices to CONCACAF knew no bounds – precisely because their relationship apparently had the secret protection of Webb and Sanz in exchange for kickbacks or other compensation.

58.    Similarly, after Cartan took over negotiations with private charter flight providers, such as Miami Air, for the Gold Cup, Cartan's resulting "services" caused CONCACAF to overpay for many of those flights.  Moreover, Cartan billed CONCACAF its management fee for these negotiations as well, even though CONCACAF managed the relationship in-house as they previously did with all charter flight arrangements without paying huge management fees to an outside firm. The same was true with respect to ground transportation services.

59.    Cartan's charges continued to add up outside of CONCACAF's line of sight, until the final invoices arrived at CONCACAF.  Cartan sent invoices to CONCACAF throughout the summer of 2013 with increasingly high management fees of 21.95%, and sometimes 25% or 33% - even higher than the 18% Webb and Sanz appeared to have ultimately agreed to with Cartan.

60.     Unaware of the nature of Cartan's relationship with Webb and Sanz, Beatriz Cosculluela ("Cosculluela"), CONCACAF's Director of Finance, asked Sanz for a written agreement with Cartan when she received the invoices with the varying Cartan management fees—which as of June 2013 already totaled over $5 million. When Sanz asked Gamba about it, he claimed the right fee was 21.95%, and that Max Mulvihill, Cartan's Director of Finance, who had been discussing this with Cosculluela, "isn't aware of our agreement," but that he "instructed Max not to discuss this with Beatriz." Cosculluela had been told by Sanz that there was an agreement with Cartan, but he never provided the contract to her.

61.     Cartan's performance at the 2013 Gold Cup continued to be poor and could not possibly justify the outrageously high management fees being charged to CONCACAF. CONCACAF staff and even national football teams complained about Cartan's inability to secure proper accommodations, adequately provide meals at hotels for teams and in one case, Cartan's failure to arrive with transportation, stranding a number of CONCACAF guests at the airport without a ride to their hotel.

62.     Cartan's overbilling and poor performance was in lockstep with the secret agreement worked out between Cartan, Webb and Sanz, to personally benefit the individuals involved, to the detriment of CONCACAF. FIFA's own competition directors began noticing and inquiring into the bizarre nature of the relationship between Cartan, Webb and Sanz. Upon FIFA's inquiry, Sanz told FIFA that CONCACAF would no longer be using Cartan for any of their services, no doubt so as to avoid any outside scrutiny of Cartan's one-sided relationship with CONCACAF.

**The Defendant's Scheme with Webb and Sanz included Bogus Invoices**

63.     Nine months and nearly $9,000,000 later, after Cartan misrepresented prices; after Cartan refused to provide any backup supporting those high charges; after Cartan's management fees kept increasing and were clearly out of step with industry pricing; and after Cartan failed to provide satisfactory services during the Gold Cup; any other reasonable President or General Secretary would have fired Gamba, Elmore

and Cartan.  Yet, instead of moving back to Byrom or another reputable service provider, or even simply commissioning an RFP to all companies to ensure pricing was fair, Webb and Sanz doubled down on their illicit relationship with Cartan.

64.     Cartan continued the scheme and implemented further improper business practices designed to defraud CONCACAF and benefit Cartan, and Webb and Sanz personally.  Cartan's "reconciliation" of Gold Cup costs—another outrageous cost for CONCACAF, as CONCACAF paid Cartan for the time its own staff spent on reconciling fees and event costs on top of which Cartan also charged their 18% management fee—included a number of suspicious invoices and bizarre one-off payments.

65.     In August 2013, after a month of complaints from Cosculluela to Cartan regarding the increasing and varying management fees, Watson asked her to stop engaging Gamba, stating "I will deal with this."  Watson needed less than an hour with Elmore to discuss the increasing fees in the months prior to and during the Gold Cup.  After his talk with Elmore, Watson responded to Cosculluela stating that Cartan agreed to readjust "all Cartan invoices since inception."  Cosculluela calculated a total of $419,904.96 overpaid management fees to Cartan.  Despite Cartan's representation that it would refund to CONCACAF the portion of its charges that were over 18%, this "refund" was swallowed up by Cartan's excessively priced invoices.

66.     In light of Cartan's "reconciliation" and abject failures during the Gold Cup, Sanz became worried when Cartan sent expensive gifts to CONCACAF staff in September 2013, so much so that he privately emailed Webb and suggested that they "spin" a message to staff that the gifts were sent to make amends for the problems Cartan caused.  Sanz was concerned that the Cartan gifts were not just a normal course-of-business "thank you," but instead would raise questions about the true nature of the Cartan relationship.  Webb readily agreed with Sanz's "spin."

67.     On October 4, 2013, in advance of the final payment for the 2013 Gold Cup, Sanz sent an email to Cosculluela declaring "Need to send Cartan 200k today,"

without any specific reason why. Cosculluela wired the standalone payment to Cartan the next day.

68.     Not long after the payment, Gamba received notice of CONCACAF's $3.3 million dollar final Gold Cup payment.  Gamba made another invoice change when he responded with an updated balance on a previously paid invoice labeled iSM2013-26v2, which had been reduced by Cosculluela to reflect the "credit" that comprised the approximately $400,000 Cartan had overcharged in fees.  Gamba's single-page, updated invoice, titled iSM2013-26v3, reflected an over $400,000 *increase* from the original charge of $860,000 on iSM2013-26v2 to $1,284,715.77. When Cosculluela pressed Gamba on the reason for the increase, Gamba emailed her, copying both Watson and Sanz; Gamba stated that the increase resulted from a poor estimation of the costs and that Cartan "realized the cost was going to be slightly higher than estimated."  The "support" for Gamba's invoice included extra costs in the "Sub-Total" section of a summary sheet provided with the new invoice that did not even add up to the total charged on the invoice.

69.     Despite Cosculluela's concerns about the additional charges, Sanz, with Cartan's knowledge and for his illicit benefit, directed Cosculluela to approve Cartan's invoice for payment later that October, without any backup justifying the cost increase.  Together, these two October invoices resulted in a combined $600,000 in unexplained "reconciled" payments for Cartan.

### Cartan's Secret Payment to CIFA on Webb's Behalf

70.     In 2013, the theme of CONCACAF's annual summit in October was appropriately titled "Transformation through Partnership."  Webb and Sanz extended invitations to vendors keen at building "partnerships" with Webb and Sanz, such as Elmore, Gamba, and Shakeel Khawaja from Forward Sports— upon information and belief, another entity used by Webb to launder illicit payments, according to the Indictment and Superseding Indictment.

71.     Shortly after the Summit, and shortly after Cartan's additional $600,000 in charges to CONCACAF, Cartan made a mysterious $600,000 loan to CIFA, the member association located in Webb's hometown of Grand Cayman and where Webb was still acting president and Watson was treasurer.  Public audits revealed that the loans were originally documented as  unsecured when they were dispersed from a Panamanian bank account owned by Cartan on December 31, 2013.  The Term Loan Agreement dated December 31, 2013 was between CIFA and Cartan International Management, Inc. for a total of $600,000, signed by Bruce Blake on behalf of CIFA, and Irena Abrego de Espinosa on behalf of  Cartan.  According to public internet sources, Ms. Abrego de Espinosa was a "subscribtor" – or person required to be present to register a company under Panamanian corporate law – of the Cartan affiliate in Panama responsible for extending the loan to CIFA.

72.     Defendant Elmore made this payment via Cartan to CIFA at the request of Webb and Watson.  Upon information and belief, this payment was arranged in part to ensure that Defendants' scheme with Webb and Sanz would continue into the foreseeable future.

73.     In December 2014, the loan documentation was altered purportedly to create some kind of sponsorship for the construction of a National Training Center. When the recent CIFA audits publicly revealed these loans had been converted to gifts, Elmore was asked about the loan agreement.  Elmore admitted to the auditors that Cartan made a charitable donation of $600,000 to CIFA in 2013, but apparently denied any affiliation with Cartan International, a company incorporated in Panama on May 23, 2013.  Elmore further stated that Cartan does not have an account or office location in Panama, but that the money was wired from a US bank account.  However, as noted above, at least one website reports Cartan International was incorporated by Gamba and Elmore in Panama, with Espinosa as subscriptor.  Upon information and belief, Cartan never provided any material amount of services to CIFA, nor did Cartan widely publicize its fictitious charitable gift—which is what typically would be

expected of a corporate sponsor.  For example, there was never any signage, billboards, or any public disclosure by Cartan or CIFA regarding this so-called "gift" from Cartan.  That is because it was not a gift at all, but yet another form of graft and illicit dealing between Defendants and Webb.

74.    Cartan was not alone in providing a significant sum to Webb's former association.  Forward Sports, the same vendor that met with Webb and Sanz during the same week as Cartan in the fall of 2012, the same vendor that attended the Summit with Cartan, also extended a $600,000 loan to CIFA, on the same day as Cartan, signed by the same Irena Abrego de Espinosa who signed the loan document on behalf of Cartan.  Notably, Forward Sports is also a company implicated in the Indictment and Superseding Indictment as one possessing Panamanian bank accounts used to effectuate several bribe payments received by Webb.

75.    These transactions caused CIFA's auditor to refuse to provide CIFA with a clean audit, and it has been reported that CIFA provided information about these transactions to the authorities in the Cayman Islands, who are presently conducting an investigation on those transactions as a result.

**The Sham "Agreement"**

76.    In April 2014, CONCACAF employees familiar with Cartan's reputation suggested to Webb and Sanz that an agreement with Cartan would be prudent to protect CONCACAF from a continuance of Cartan's practice of excessive overbilling and unsupported invoices.  Over the next eight months, Webb and Sanz dismissed these comments and any inquiries regarding the existence of a contract.  But, the frequency of questions only continued to increase as CONCACAF employees geared up for planning 2015 Gold Cup.

77.    In August of 2014, CONCACAF's directors including Cosculluela asked Webb and Sanz, again, about the existence of an agreement with Cartan.  To placate these requests, Webb informed CONCACAF staff that a contract was being drafted. A week later, Gamba visited the offices of CONCACAF, where he was becoming an

increasingly common fixture, and spoke with Cosculluela about the agreement. When Cosculluela asked if a contract was completed yet, she was surprised when Gamba told her "we've had a contract in place since January." Cosculluela stated in an email to other CONCACAF directors dated August 18, 2014, that she planned on asking Gamba directly for the contract since he apparently had a copy for eight months while no one at CONCACAF possessed a copy. Cosculluela concurrently attempted to find a copy of the contract in CONCACAF's offices; neither Sanz nor Webb, nor their assistants, could locate copies of the written "agreement".

78.     The following month, CONCACAF's directors raised another alarm to Webb and Sanz regarding the Cartan relationship. In a September 19, 2014, email, Jurgen Mainka, a CONCACAF director, was accidentally copied on a Cartan email discussing prices charged for pre and post-event planning. In the email, Cartan staff discussed costs for contracted staff for CONCACAF events. When questioned about the proper billing rate, Cartan's Director of Finance, Max Mulvihill, stated: "We need to charge more than what we paid the temporary staff. I don't know what the rate is, previously I think *Daniel [Gamba] just put whatever he felt he could bill* but something has to be agreed for a certain level of staffing." (Emphasis added). This was particularly egregious, because CONCACAF staff repeatedly complained that Cartan's regular practice was to overstaff events. And, given that Cartan not only collected these additional and excessive staffing fees from CONCACAF, Cartan charged CONCACAF their additional 18% management fee that applied to Cartan's staffing charges as well. If the previous cycles of billing were not alarming enough, the email lays bare Cartan's intentional overbilling and the prevailing view that CONCACAF was a cash cow. While this email was forwarded to Webb and Sanz, neither ever addressed the issue. The email was dismissed and ignored.

79.     Concern about Cartan continued to increase among CONCACAF's employees, in part because Sanz's absence due to illness prevented him from quelling

internal suspicion at CONCACAF as he had in the past.  CONCACAF's directors attempted to address the problems surrounding Cartan amongst themselves.

80.    Gamba physically dropped off a copy of a purported written "agreement" between Cartan and CONCACAF at CONCACAF's office on September 19, 2014. This was the first time any written agreement surfaced even though CONCACAF already paid millions of dollars to Cartan by that time, and CONCACAF employees had been requesting an agreement with Cartan for over eight months.  The "agreement" was dated "as of January 1, 2014," but with no signature date or any indication of when the agreement was actually signed.  The purported agreement was executed by Webb, Sanz, Elmore and Gamba.

81.    The written document Gamba dropped off did not reflect a meeting of the minds between Cartan and CONCACAF because no one at CONCACAF understood what the true terms of the agreement were.  Rather, the purported written agreement served a discrete purpose of hiding the nefarious reality of the relationship between Cartan and Webb and Sanz to the detriment of CONCACAF.

82.    But the appearance of this purported agreement did little to satiate the questions and suspicions.  Fearing a repeat of the last two years, a group of CONCACAF's directors which included Cosculluela, Mainka, and Inaki Alvarez ("Alvarez"), a former Director of Programs for FIFA's World Cup, sought an amendment to the so-called contract with Cartan.  They requested a meeting with Elmore and Cartan on October 20, 2014, to address the issues concerning the Cartan relationship, particularly given that the contract had mysteriously appeared for the first time just two weeks earlier.

83.    Webb reluctantly agreed to allow staff to meet with Cartan, but he did not attend that meeting.  Nonetheless, Webb and Sanz made clear to CONCACAF staff that they had to continue working with Cartan, and that they would not be working with any other competing vendors.

84.   For example, Byrom, FIFA's preferred travel provider who CONCACAF had utilized in the past for event management services, reached out to Sanz in an email on November 14, 2014, to determine whether it was true that Cartan had an exclusive arrangement with CONCACAF.  Sanz informed Byrom that the Cartan agreement extended to future CONCACAF events, effectively squelching any competition for Cartan.  Byrom thereafter did no further business with CONCACAF.

85.   Nancy Rispoli, Marriott's Account Executive, reached out to Webb after hearing of Cartan's unwillingness to provide Marriott invoices for services provided to CONCACAF.  Rispoli offered to send the contracts from the Marriott directly to CONCACAF staff, in an email to Webb dated December 12, 2014.  But, to keep CONCACAF from learning the extent of Cartan's fraud, Webb instructed Rispoli to "work with and invoice Cartan directly."  There was no legitimate business reason to take steps to ensure CONCACAF staff could not have any ability to audit or confirm the charges for various services in Cartan's invoices.

**Cartan, Webb, and Sanz Continue to Protect Their Arrangement**

86.   While Webb, Sanz, and Cartan reluctantly agreed to the creation of an "amendment" to the contract, they prevented the employees' efforts from entirely unraveling their actual arrangement.  Over the course of the negotiations, Webb and Sanz were adamant about certain terms that benefited Cartan, and by extension themselves, in the amendment.  When repeatedly questioned about whether he truly agreed to an 18% management fee during discussions of a possible amendment, which was excessive to those who were responsible for CONCACAF's logistics, Webb unequivocally affirmed his acceptance of the Cartan 18% management fee.

87.   During the October 20, 2014 meeting, CONCACAF directors believed they had obtained Cartan's agreement to provide them with backup receipts for the charges being incurred, and to an agreement to negotiate fixed fees for pre and post-event services.  Negotiating fixed fees for that work was important to CONCACAF

staff because they had no ability to control Cartan staffing decisions, rates for CONCACAF staff, or the time Cartan charged CONCACAF for reconciling invoices.

88.    Despite this progress in the eyes of CONCACAF staff, it all turned out to be a ruse, as Webb and Sanz, with Cartan's knowledge, made sure that they and Cartan would continue the status quo notwithstanding any proposed amendment.

89.    Alvarez, CONCACAF's new director of operations, was a particularly vocal critic of Cartan and what he observed as a one-sided, dysfunctional relationship that grossly and unfairly favored Cartan.  Alvarez was a former FIFA executive responsible for the logistics for major FIFA events like the World Cup when he moved from FIFA to CONCACAF in or about July 2014.   One of the first events he worked on for CONCACAF was the Central American tournament known as the "Copa Centroamericana", which took place in September 2014.  Initially, Cartan invoiced CONCACAF $3 million  for an "estimate" of that tournament.  But in reality, the costs were grossly overstated.  One of the most egregious examples was ground transportation, where Cartan was seeking to maintain its 18% management fee while also subcontracting ground transportation to another company who separately sought a 15% management fee – which would have resulted in CONCACAF paying 33% in management fees for ground transportation alone.

90.    Alvarez saw right away that the ground transportation costs were grossly excessive.   He found a competitor to submit a competing bid – which resulted in more than a $500,000 in savings to CONCACAF, and *no* additional management fee. Alvarez's intervention cost Cartan close to $100,000 in lower management fees, making Alvarez an obvious obstacle to the Defendants.

91.    After his Copa Centroamericana experience with Cartan, Alvarez, like other CONCACAF staff members, was looking for ways to avoid Cartan going forward.  On November 12, 2014, with no advance notice or context, Webb instructed Alvarez to fly down the next day for a meeting in Jamaica on November 12, 2014. When Alvarez arrived, he encountered both Webb and Gamba ready to meet him to

discuss the Cartan relationship.  The three discussed Cartan's role in CONCACAF events.  Alvarez pushed Gamba to accept that CONCACAF could use other outside vendors to provide services such as  charter flights and ground transportation as they were outside Cartan's expertise.  Webb told Gamba to "play nice."  When Webb reacted positively to Alvarez's comments about using other outside vendors, Gamba did not object.  Alvarez thus thought he had the green light to separately arrange for other third party providers outside of Cartan's expertise, such as, for example, ground transportation and negotiations with air charter services.

92.     Shortly thereafter, Cartan returned a redline of the draft amendment CONCACAF staff sent after their meeting with Cartan, reflecting what CONCACAF staff understood were the agreed upon terms for a revision to the written "agreement". Significantly, in its redline markup Cartan struck out any reference to providing back-up receipts to support invoices before invoices would be paid, and they added a brand new term, Cartan was now going to be entitled to a $300,000 retainer.  When Webb was shown the Cartan markup, he simply instructed the CONCACAF team to accept all of Cartan's changes—ignoring what CONCACAF staff had requested.

93.     For much of 2014, Sanz had been out of the office for lengthy periods of time due to his illness.  As of January 1, 2015, however, he returned to the office full time.  When he returned, he found the CONCACAF staff concerned and more suspicious of the Cartan relationship.  Sanz recognized that he had to do something, and in January 2015 solicited the CONCACAF directors for their views about the situation with Cartan.  Alvarez described the immense costs Cartan imposed on CONCACAF and his sense that, within Cartan, "there seems to be a prevailing attitude that CONCACAF is a cash cow."  Alvarez's continued vocal criticisms of the amendment negotiations applied pressure on Webb and Sanz's ability to maintain the status quo of their arrangement with Cartan.

94.     Cartan provided Sanz with a way to reverse the progress made by CONCACAF's employees, and strengthen the agreement between Cartan, Webb, and

Sanz.  On January 16, 2015, Cartan's attorney wrote a letter to Webb on behalf of Cartan, informing him that CONCACAF violated the exclusivity provision of its agreement with Cartan, and was required to use Cartan as the "sole and exclusive provider of services."  That letter alleged that CONCACAF staff used other travel providers for events such as the Copa Centroamericana and a CONCACAF Workshop.

95.     The incidents referred to in Cartan's legal letter involved Alvarez, who found better and cheaper providers for the services Webb, Gamba, and he had discussed and agreed could be used by vendors other than Cartan during their November 12, 2014 meeting in Jamaica.  Notwithstanding the fact Gamba did not object to this arrangement at that meeting, Cartan's lawyer had sent this letter.  Sanz never bothered to check with Alvarez about Cartan's claims.

96.     Webb and Sanz's campaign to ensure that CONCACAF staff did not derail their own relationship with Cartan was ultimately successful. At the end of January 2015, Sanz and Gamba spoke about  the "issues" Gamba was having with CONCACAF staff.  Sanz thereafter issued a mandate to CONCACAF staff that all travel was to be directed through Cartan without doing anything to address the many complaints and issued about Cartan raised by CONCACAF staff. Two days after the mandate to CONCACAF employees, Sanz responded in a single paragraph to Cartan's lawyer, stating that "corrective action" was taken.  Sanz never mentioned the problems precipitated by Cartan at the expense of CONCACAF, no doubt because the arrangement with Cartan was too personally profitable for Sanz and Webb to lose.

97.     Without knowledge or approval of the ExCo, the amendment was ultimately signed by Webb and Sanz while in Costa Rica where Webb spent most of February meeting with a number of his friends and personal contacts, many of whom are named in the Indictment for schemes involving kickbacks and bribes.

98.     The document that resulted from the negotiations with Elmore and Gamba was an amendment to an agreement that never existed in the first place.  There could never be a proper meeting of the minds between CONCACAF's team and

Cartan because the *actual* terms and conditions of this "agreement" were never known or disclosed to CONCACAF.  In fact, the purported agreement was between Webb, Sanz and Cartan, and not CONCACAF.

99.     For Cartan's benefit, and with Cartan's knowledge, Webb and Sanz continued to take steps to prevent any future disruptions or questioning of the Cartan arrangement.

100.   For example, even though the CONCACAF team negotiated a "fixed fee" for pre and post-event services and the right to review and approve contracts associated with services, neither Sanz nor Webb *ever invoked* these provisions for a single event or permitted the staff to engage in such negotiations even for the upcoming 2015 Gold Cup, evidencing once again that the true terms of any "agreement" were between Elmore, Gamba, Webb, and Sanz, and entirely undisclosed and unknown to CONCACAF.

101.   Sanz also instructed Cosculluela to not share or review Cartan's invoices with the program directors.  Directors, still responsible for their event budgets, were now entirely unable to review invoices relating to their largest expense even if only to confirm the services Cartan was charging for were requested by those directors.  And Cosculluela was now unable to confer with directors regarding the accuracy of the Cartan charges.

102.   Cartan also had instructed its travel agents to not discuss fees for travel with CONCACAF staff.  Marjorie Burrell ("Burrell"), a Cartan employee installed at CONCACAF's Cayman office earlier in late 2013, was supposed to provide convenience for CONCACAF staff travel bookings.  However, as with all things Cartan, it appeared her installation only served as a direct conduit for Cartan to bypass CONCACAF staff when booking travel.  Burrell, along with the other Cartan employees, was instructed to not provide CONCACAF employees with any detail regarding flight and travel fees.  She also was used as a direct line by Webb to book private trips and clandestine rendezvous for him and his numerous extramarital

girlfriends which would be surreptitiously paid for by CONCACAF, with Cartan also charging CONCACAF its 18% management fee on top of those personal expenses Cartan knew these expenses should not have been charged to CONCACAF.

103.   Cartan also began inserting itself into any process or plan to find alternative, cost-effective services.  In planning transportation for the 2015 Gold Cup, Alvarez secured alternatives for ground transportation without the use of Cartan— even though Cartan would still be charging its 18% management fee on top of these services.  Gamba told Sanz he would help CONCACAF "evaluate" the current bids received from service providers.  After Gamba received all of the relevant information from the previous two bids, he suggested a third, ostensibly unaffiliated provider called MV Transportation ("MV").  However, after Gamba received Sanz's approval for MV's bid, Howard and Alvarez discovered that the bid was prepared not by MV, but by Cartan.  MV also was the ground transportation company that Gamba intended to utilize for the Copa Centroamericana until Alvarez derailed Gamba's plan and found a much more reasonably priced alternative.  It was apparent that Gamba used the confidential information from the other two bids to formulate a winning bid for Cartan's preferred provider, MV.  Sanz selected MV anyway.   Not surprisingly, MV materially under-estimated the staff required for the Gold Cup, which was supplemented by Cartan staff at much higher rates.  As a consequence, CONCACAF ended up paying far more for ground transportation for the 2015 Gold Cup, ultimately increasing the Cartan fees being charged as well.

104.   Leading up to the 2015 Gold Cup, Howard, Alvarez and the CONCACAF team continued to request agreements and contracts from Cartan regarding service and accommodations providers, to no avail.  Cartan's refusal to provide contracts for auditing their expenses was coupled with Sanz's claim that Howard and Alvarez only "really need [a] summary of services/obligation and not the executed agreement."  Such summaries made it impossible to verify any of the charges being made by Cartan, or to review other material terms of the hotel contracts.

COMPLAINT FOR DAMAGES

### **The Scheme's Unraveling**

105.   In May 27, 2015, with the 2015 Gold Cup a few weeks out, Webb was arrested in a sweeping investigation that exposed a conspiracy in which Webb and Sanz were central actors for accepting bribes and kickbacks.  The Superseding Indictment alleges that, together with their co-conspirators, Webb and Sanz were accepted kickbacks estimated at more than $200,000,000 from media rights and sports marketing companies in kickbacks and bribes, as well as other misconduct that victimized CONCACAF, FIFA and other football entities.

106.   In the midst of the upheaval, CONCACAF still had to ensure the success of its flagship and months-in-the-making event, the 2015 Gold Cup, scheduled to have its matches begin the first week of July.  CONCACAF had no choice but to continue to utilize Cartan and figure out later whether Webb's and Sanz's "pay to play" kickback schemes extended to Cartan as well.

107.   CONCACAF began a review of the dealings of its former President and General Secretary, including the arrangement with Cartan.  CONCACAF's subsequent review of invoices approved by Webb and Sanz showed not only an affirmative disregard for the well-being of CONCACAF, but a willingness to use it as a vehicle for personal profit.  Review of the budgets presented to the ExCo committee over the two years revealed that Webb and Sanz directed and monitored employees responsible for creating the budgets.  "Too much detail" was the phrase written in email after email until the budget sufficiently buried Cartan's exorbitant costs under the category "General and Administrative Expenses."

108.   In August 2015 news reports surfaced revealing the suspicious loans made to CIFA from two private companies, which CONCACAF since has confirmed were Cartan and Forward Sports.  Despite Cartan's denial of any association with a bank account in Panama, the audit report disclosed that the money was wired from their bank account located in Panama, where Cartan also had an office at the time.

109.   Cartan's use of Webb and Sanz to line its own pockets, not through the merits of arms-length business transactions, but through the medium of Webb and Sanz and their associates caused two years of turmoil for CONCACAF and the numerous associations and programs it administers.  The scope of Cartan's alleged fraud cost CONCACAF not less than a remarkable $10 million in wrongful and abusive charges over two years, an amount that ultimately will be determined at trial.

110.   Cartan pillaged CONCACAF while Webb and Sanz deliberately sabotaged attempts by CONCACAF's employees and CONCACAF's ExCo to determine the nature of the fraudulent scheme.

111.   On November 30, 2015, after it was clear Cartan refused to take responsibility for its misconduct, and that Cartan's history of gouging CONCACAF was vast, unauthorized and abusive,  CONCACAF terminated the purported agreement with Cartan and all of its affiliates.  CONCACAF now is back to paying market rates to a travel agent for air travel – a $25 per transaction fee for domestic bookings.

## FIRST CAUSE OF ACTION

### (Fraud in the Inception of the Engagement Against Elmore Sports Group, Cartan Tours, iSportsMarketing, and Gant Travel)

112.   CONCACAF hereby repeats and realleges, as if fully set forth herein, the allegations set forth in Paragraphs 1 through 111 above.

113.   Prior to, and during, the engagement of CONCACAF as a travel services provider, Elmore Sports Group, Cartan Tours, iSportsMarketing, Gant Travel, by and through its officers and agents Elmore and Gamba, entered into an arrangement with Webb and Sanz that was replete with fraudulent terms, clearly designed to facilitate a kickback scheme. The true nature of the arrangement was not known to CONCACAF because Cartan and Webb and Sanz willfully concealed from CONCACAF material facts about the engagement in order to wrongfully take CONCACAF funds for the

benefit of the Defendants, Webb, and Sanz, as set forth in Paragraphs 31 through 39, and 76 through 81 above.

114.   Cartan knew that its statements were false and that its omissions and concealments were material, demonstrated by the fact that it never sent documentation necessary to audit or otherwise verify invoices and fees, and documentation required to carry out its representations to CONCACAF regarding its services provided. Cartan's representation that it would engage in contracts of accommodations in the interest of CONCACAF was also false and misleading because Cartan and its officers engaged in multiple frauds and breaches of fiduciary duty to the great financial detriment of CONCACAF.  Cartan, furthermore, intentionally omitted material information regarding the true nature of the agreement, therefore obscuring the true reason for Cartan's retention and thus the terms by which Cartan was able to enrich itself at CONCACAF's expense.

115.   Cartan, by and through its officers and agents Elmore and Gamba, made these statements and suppressed material facts with the intent to induce CONCACAF to engage Cartan without knowledge of Cartan's actual intent not to perform, Cartan's actual charges, and without knowledge of the true nature of the engagement.

116.   CONCACAF justifiably relied on Cartan's statements in dealing with Cartan, and reasonably did not discover the true nature of the engagement due to Defendants' numerous omissions and scheme with Webb and Sanz.

117.   CONCACAF was damaged when the nature of the engagement was fundamentally contrary to what Cartan indicated.

118.   Because of Cartan's fraud, there was never a true meeting of the minds in coming to terms on the engagement between Cartan and CONCACAF.

119.   CONCACAF's engagement of Cartan is, thus, void, because of Cartan's fraud in the inception of the engagement, which entitles CONCACAF to restitution, disgorgement and/or damages.

## SECOND CAUSE OF ACTION

35

**(Breach of Fiduciary Duty Against Elmore Sports Group, Cartan Tours, iSportsMarketing, and Gant Travel)**

120.  CONCACAF hereby repeats and realleges, as is fully set forth herein, the allegation set forth in Paragraphs 1 through 119 above.

121.  Defendants Elmore Sports Group, Cartan Tours, and iSportsMarketing, as Sellers of Travel, owe CONCACAF fiduciary duties of care, loyalty, and good faith, as set forth in Cal. Bus. & Prof. Code § 17550 *et seq*, and because of the duties of loyalty and care owed by an agent to its principle, pursuant to Cartan's relationship with CONCACAF resulting from its exclusive event management arrangement.

122.  Defendants Elmore Sports Group, Cartan Tours, iSportsMarketing, and Gant Travel breached their fiduciary duties to CONCACAF when they, *inter alia* and as further detailed above, did not perform the services they were engaged to perform, entered into an kickback or otherwise fraudulent scheme with Webb and Sanz to benefit from grossly excessive fees charged to CONCACAF, by misrepresenting extra charges and failing to return erroneously charged funds, and by failing to abide by the duties imposed by Cal. Bus. & Prof. Code §§ 17550.13-14.

123.  CONCACAF, in response to Defendant Companies' numerous statements of expertise and ability, reasonably relied on Defendant Companies to provide services as Sellers of Travel, and as experts purporting to offer their best efforts in effectuating their vital role in an organization that planned, sponsored, and otherwise supported numerous major events.

124.  As a direct and proximate result of Defendants' breaches of fiduciary duty, CONCACAF was damaged, which entitles CONCACAF to restitution, disgorgement, and/or damages.

COMPLAINT FOR DAMAGES

## THIRD CAUSE OF ACTION

### (Constructive Fraud Against Elmore Sports Group,

### Cartan Tours, iSportsMarketing, and Gant Travel)

125.   CONCACAF hereby repeats and realleges, as if fully set forth herein, the allegations set forth in Paragraphs 1 through 124 above.

126.   Defendants Elmore Sports Group, Cartan Tours, iSportsMarketing, and Gant Travel, as Sellers of Travel, owe CONCACAF fiduciary duties of care, loyalty, and good faith, as set forth in Cal. Bus. & Prof. Code § 17550 *et seq*, and because of the duties of loyalty and care owed by an agent to its principle, pursuant to Cartan's relationship with CONCACAF resulting from its exclusive event management arrangement.

127.   Defendants Elmore Sports Group, Cartan Tours, iSportsMarketing, and Gant Travel breached their fiduciary duties to CONCACAF as set forth in Count 4.

128.   The conduct of Defendants in breaching their duties was fraudulent.

129.   As a direct and proximate result of Defendants' breaches of fiduciary duty, CONCACAF was damaged, which entitles CONCACAF to restitution, disgorgement, and/or damages.

## FOURTH CAUSE OF ACTION

### (Aiding and Abetting a Breach of Fiduciary

### Duty Against Defendants Elmore and Gamba)

130.   CONCACAF hereby repeats and realleges, as if fully set forth herein, the allegations set forth in Paragraphs 1 through 129 above.

131.   Elmore and Gamba had actual knowledge of Webb and Sanz fiduciary duties to CONCACAF as President and General Secretary of CONCACAF.

132.   Webb and Sanz breached their fiduciary duties to CONCACAF as outlined above in Paragraph 31 through 41 above, by *inter alia*, entering into an improper relationship with Cartan, the ultimate purpose of which was to facilitate a

37

systematic plundering of CONCACAF's coffers, in violation of Webb and Sanz duties of good faith, care, and loyalty.

133.   Elmore and Gamba knew of the breaches by Webb and Sanz because they were integral members in facilitating their breach of fiduciary duty.

134.   Elmore and Gamba intentionally assisted Webb and Sanz breaches by concealing the agreement, its nature, and details of the amounts invoiced to CONCACAF.

135.   As a direct and proximate result of Elmore and Gamba's assistance with and participation in Webb and Sanz's breach of fiduciary duty, CONCACAF was damaged monetarily, which entitles CONCACAF to restitution, disgorgement and/or damages.

## FIFTH CAUSE OF ACTION

### (Conspiracy to Commit Fraud Against All Defendants)

136.   CONCACAF hereby repeats and realleges, as if fully set forth herein, the allegations set forth in Paragraphs 1 through 135 above.

137.   Defendants owed CONCACAF a duty of reasonable care as Sellers of Travel per Cal. Bus. & Prof. Code § 17550, and because of the duties of loyalty and care owed by an agent to its principle, pursuant to Cartan's relationship with CONCACAF resulting from its exclusive event management arrangement.

138.   Defendants agreed to misrepresent material information to CONCACAF in order to induce CONCACAF to pay inflated fees.

139.   Defendants knowingly participated in making these representations, as set forth in Paragraph 55-60 *inter alia*.

140.   As a direct and proximate result of Defendants' agreement, CONCACAF was damaged monetarily which entitles CONCACAF to compensatory damages.

## SIXTH CAUSE OF ACTION

### (Conspiracy to Commit Breach of Fiduciary Duty Against All Defendants)

141.   CONCACAF hereby repeats and realleges, as if fully set forth herein, the allegations set forth in Paragraphs 1 through 140 above.

142.   Defendants owed CONCACAF a duty of reasonable care as Sellers of Travel per Cal. Bus. & Prof. Code § 17550, and pursuant to Cartan's exclusive event management arrangement.

143.   Defendants agreed to misrepresent material information to CONCACAF in order to induce CONCACAF to pay inflated fees and invoices without supporting information, and otherwise breached their fiduciary duties by agreeing and engaging in such conduct, and failing to meet the requirements of the Cal. Bus. & Prof. Code §§ 17550.13-14.

144.   Defendants knowingly participated in making these representations.

145.   As a direct and proximate result of Defendants' agreement, CONCACAF was damaged monetarily which entitles CONCACAF to compensatory damages.

## SEVENTH CAUSE OF ACTION

### (Conversion Against All Defendants)

146.   CONCACAF hereby repeats and realleges, as if fully set forth herein, the allegations set forth in Paragraphs 1 through 145 above.

147.   At all times relevant, CONCACAF had a right to possess the funds in its accounts.

148.   Defendants wrongfully converted CONCACAF funds when it misrepresented the nature of the management fees to CONCACAF employees, when it required enormous deposits without supporting evidence, charged fees greater than the percentage indicated in invoices, and when Defendants agreed to refund CONCACAF over $400,000 that Defendants conceded were overcharged due to misrepresented fees.  Defendants were not entitled to these amounts.

149.   As a direct and proximate result of iSportsMarketing's conduct, CONCACAF was damaged monetarily, which entitles CONCACAF to restitution, disgorgement and/or damages.

## EIGHTH CAUSE OF ACTION

**(Violation of Cal. Bus. & Prof. Code § 17200 *et seq.*, Unlawful, Unfair, and Fraudulent Business Practices, Against Defendants)**

150.   CONCACAF hereby repeats and realleges, as if fully set forth herein, the allegations set forth in Paragraphs 1 through 149 above.

151.   Defendants engaged in unlawful business practices without privilege, justification, or excuse.  Among other things, Defendants, as Sellers of Travel, violated Cal. Bus. & Prof. Code § 17550 *et seq*, by failing to conspicuously set forth the total amount to be paid by CONCACAF in invoices, failing to set forth all cancellation conditions with third party transportation and travel services, and upon information and belief, failing to establish a trust account from which to receive CONCACAF payments. Defendants also committed commercial bribery in violation of Cal. Pen. Code § 641.3(a).

152.   Defendants also engaged in unfair business practices without privilege, justification, or excuse as set forth herein.  Defendants misrepresented their grossly excessive management fees, the true purpose of the engagement, and prevented CONCACAF from obtaining the information necessary to understand the services being rendered, and including the following:

      a)   Defendants failed to disclose the true nature of their relationship with Webb and Sanz;

      b)   Defendants omitted executed contracts and backup necessary to verify the accuracy of invoices charged to CONCACAF;

      c)   Cartan stated that it provides "first class" travel programs;

      d)   Cartan stated that it provides "special group fares" for air travel;

e)   Cartan stated it would provide services in a professional manner using reasonable care and skill;

f)   Gamba stated that Cartan would negotiate for better rates with hotels and that these rates would be better than what CONCACAF had negotiated directly with hotels;

153.   CONCACAF is a consumer of Defendants' travel services.

154.   Defendants also engaged in fraudulent business practices without privilege, justification, or excuse, through, among other things, the misstatements and omissions of material fact alleged above in paragraph 152.

155.   Defendants engaged in their misconduct to, among other things, undermine CONCACAF's ability to conduct its business, improve its financial position, so that Defendants could maximize compensation for themselves.

156.   The foregoing misconduct constitutes unlawful, unfair, and fraudulent business practices in violation of the California Unfair Competition Law and, as a direct and proximate result of such practices, CONCACAF has suffered injury that entitles it to restitution, disgorgement and/or damages, and such other relief as may be permitted under Business & Professions Code § 17200 *et seq*.

## **REQUEST FOR RELIEF**

### **(All Claims)**

WHEREFORE, CONCACAF respectfully requests the Court to enter judgment in its favor on all Causes of Action and award CONCACAF the following relief:

A.   Compensatory, consequential, incidental and/or special damages, in an amount to be determined at trial, but far exceeding $75,000;

B.   Restitution, disgorgement and/or damages as are permitted by law and under California Business & Professions Code §17200 *et seq*;

C.   Exemplary damages pursuant to Section 3294(a) of the California Civil Code;

1    D.    Costs of suit incurred herein; and

2    E.    Such other and further relief as the Court deems just and proper.

3                              **JURY DEMAND**

4                              **(All Claims)**

5    CONCACAF demands trial by jury on all claims for damages.

6
7    DATED:    December 21, 2015        **SIDLEY AUSTIN LLP**

8                                       By: /s/ Rollin A. Ransom
9                                           Rollin A. Ransom

10                                      Attorneys for Plaintiff Confederation of
                                        North, Central American and Caribbean
11                                      Association Football

---

42